The Honorable Joe Molinaro State Representative 204 Amber Oaks Drive Sherwood, Arkansas 72120
Dear Representative Molinaro:
This is in response to your request for an opinion, on behalf of Mr. Buford Camp, as to whether the requirement of an eye examination when applying for an Arkansas driver's license is in violation of the Americans with Disabilities Act ("ADA"),42 U.S.C. § 12101 et seq.
It is my opinion that the answer to your question is "no."
I assume that your question pertains to the requirements set forth in A.C.A. § 27-16-704 (Repl. 1994), which provides in pertinent part:
 (a) Every applicant for a driver's license, except as otherwise provided in this act, shall be examined in accordance with the provisions of this section.
 (b)(1) The examination shall be held in the county where the applicant resides within not more than thirty (30) days from the date application is made.
 (2) The examination shall include a test of the applicant's eyesight, ability to read and understand the highway traffic laws of this state, and shall include an actual demonstration of the applicant's ability to exercise ordinary and reasonable control in the operation of a motor vehicle, and such further physical and mental examination deemed necessary by the office [of Driver Services] to operate a motor vehicle safely upon the highways.
 (3) The test of the applicant's eyesight shall examine his visual acuity to read road signs and identify objects at a distance.
 (4) The applicant shall have a minimum uncorrected visual acuity of 20/40 for an unrestricted license and a minimum corrected visual acuity of 20/50 for a restricted license. The applicant's field of vision shall be at least one hundred forty degrees . . . for a person with two (2) functional eyes and at least one hundred five degrees . . . for a person with one (1) functional eye.[1]
 (5) Applicants who fail the eyesight test shall be instructed that they should have their eyes examined by an eye care professional and secure corrective lenses, if necessary.
 (6) The test of the applicant's eyesight shall be made on an optical testing instrument approved under standards established by the Director of the Department of Finance and Administration and the Department of Arkansas State Police.[Emphasis added.][2]
* * * *
Part A of Subchapter II of the ADA (42 U.S.C. § 12131 et seq.) is the section of the federal act which is potentially relevant in the context of your question since it prohibits public entities from discriminating on the basis of disability. Under that subtitle, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The term "public entity," as appears in the foregoing provision, is defined to include any state or local government (see 42 U.S.C. § 12131(1)), and thus its prohibitions would clearly apply to the Office of Driver Services. The federal regulations adopted by the United States Department of Justice implementing part A of subchapter II (as required by 42 U.S.C. § 12134), as well as the Justice Department's analysis of those regulations, make clear, however, that the eyesight test requirement for a driver's license would not be violative of the ADA. In this regard,28 C.F.R. § 35.130(b)(8) (1993) provides:
 A public entity shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered.
With respect to the foregoing regulation, the Department of Justice, in the preamble (or appendix) written by the Department to explain the rules, states the following:
 . . . paragraph (b)(8) [of 28 C.F.R. § 35.130] prohibits the imposition of criteria that `tend to' screen out an individual with a disability. This concept . . . makes it discriminatory to impose policies or criteria that, while not creating a direct bar to individuals with disabilities, indirectly prevent or limit their ability to participate. For example, requiring presentation of a driver's license as the sole means of identification for purposes of paying by check would violate this section in situations where, for example, individuals with severe vision impairments or developmental disabilities or epilepsy are ineligible to receive a driver's license and the use of an alternative means of identification, such as another photo I.D. or credit card, is feasible.
 A public entity may, however, impose neutral rules and criteria that screen out, or tend to screen out, individuals with disabilities if the criteria are necessary for the safe operation of the program in question. Examples of safety qualifications that would be justifiable in appropriate circumstances would include eligibility requirements for drivers' licenses, or a requirement that all participants in a recreational rafting expedition be able to meet a necessary level of swimming proficiency. Safety requirements must be based on actual risks and not on speculation, stereotypes, or generalizations about individuals with disabilities. [Emphasis added.]
The Department of Justice, which is charged with the responsibility of promulgating regulations to implement Part A of Subchapter II of the ADA, thus makes a specific reference to the allowance of safety criteria for obtaining drivers' licenses. These criteria must, however, according to the Justice Department be based on "actual risks and not on speculation, stereotypes, or generalizations about individuals with disabilities." It is my opinion that the eye examination requirement found in A.C.A. §27-16-704 meets this test. The eyesight test set forth therein is required of all applicants for a driver's license (and all applicants for renewal of licenses, see A.C.A. § 27-16-901), and, on its face, the requirement that an individual have a minimum level of visual acuity in order to safely operate a motor vehicle is, in my opinion, a "safety qualification" that is based on "actual risks and not on speculation, stereotypes, or generalizations about individuals with disabilities." Support for the latter proposition can be found in the emergency clause to Act 193 of 1989, which established standards for the testing of eyesight of driver license applicants and amended, among other statutes, A.C.A. §§ 27-16-704 and 27-16-901, and which states in pertinent part:
 It is hereby found and determined by the Seventy-Seventh Arkansas General Assembly that Arkansas does not currently have any specific standards for testing the eyesight of motor vehicle and motorcycle operators; that after the initial eyesight test of an applicant for a motor vehicle or motorcycle operator's license, Arkansas does not require on renewal of the license any subsequent examination of any driver's eyesight, and therefore all drivers on the public streets and highways are endangered since many drivers with less than adequate visual acuity are able to receive or renew their motor vehicle or motorcycle operator's license . . . In order to prevent any further endangerment of the driving public . . . an emergency is hereby declared to exist and this act being necessary for the preservation of the public peace, health and safety shall be in full force from and after July 1, 1989.
Ark. Acts 1989, No. 193, § 12.
Thus, the legislative intent behind the eyesight exam requirement, as evidenced in part in the emergency clause set out above, was clearly related to safety concerns and "actual risks." Accordingly, it is my opinion that the eyesight test for driver license applicants falls within the Department of Justice's stated exception to the ADA and thus does not violate the ADA.[3]
The foregoing opinion, which I hereby approve, was prepared by Assistant Attorney General Nancy A. Hall.
Sincerely,
WINSTON BRYANT Attorney General
WB:NAH/cyh
[1] See also A.C.A. § 27-16-804(c) (Repl. 1994) (providing for a restricted driver's license for those licensees who have a tested uncorrected visual acuity of less than 20/40; also prohibits all persons who have a tested corrected visual acuity of less than 20/50 and those who have a field of vision of less than one hundred forty degrees with two functioning eyes or less than one hundred five degrees with one functioning eye from operating a motor vehicle, motorcycle, or motor-driven cycle).
[2] Passage of the eyesight test required by A.C.A. § 27-16-704
is also required for renewal of a driver's license. See A.C.A. § 27-16-901(b) (Repl. 1994).
[3] With respect to the applicability of the ADA to motor safety requirements, it is also helpful to note that one court has held that a mandatory state motorcycle helmet law does not violate the ADA because the ADA contains no reference to operation of motor vehicles. See Buhl v. Hannigan,16 Cal. App. 4th 1612, 20 Cal. Rptr. 2d 740 (1993). In that case, one of the appellants, who was hearing impaired, argued that he could not ride his motorcycle while wearing a helmet because his hearing aid (which he needed to hear the sounds of traffic) produced feedback. Accordingly, the appellant claimed, the mandatory helmet law placed an undue burden on hearing impaired motorcyclists. In rejecting this contention, the Court in Buhl
stated:
 In the first place, we do not read . . . the ADA . . . to address the issue of the right of a disabled person to operate a motor vehicle or motorcycle. The ADA provides `no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.' (42 U.S.C. § 12132). It mandates the handicapped have access to public transportation, buildings, facilities and communications, but it contains no reference to operation of motor vehicles. . . .
Id. 16 Cal. App. 4th at 1623, 20 Cal. Rptr. 2d at 746.